UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Trustee, for the Benefit of the
Holders of COMM 2016-CCRE28 Mortgage Trust
Commercial Mortgage Pass-Through Certificates,
Series 2016-CCRE28,

Plaintiff,

-against-

DAVID CHARLES HARRISON and IAN PAGET,

Defendants.

Civil Case No.: 1:24-cv-07373

**COMPLAINT**

Plaintiff Wilmington Trust, National Association, as Trustee, for the Benefit of the

Holders of COMM 2016-CCRE28 Mortgage Trust Commercial Mortgage Pass-Through

Certificates, Series 2016-CCRE28 ("*Plaintiff*"), asserts this action against Defendants David

Charles Harrison and Ian Paget and, in support thereof, alleges as follows:

## SUMMARY OF COMPLAINT

1.       Plaintiff brings this action to recover more than $4 million due and owing under a

Guaranty of Recourse Obligations dated December 9, 2015 ("*Guaranty*"), duly executed by

Defendants David Charles Harrison and Ian Paget ("*Harrison*," "*Paget*," and, collectively,

"*Guarantors*"). A true and correct copy of the Guaranty is attached hereto as **Exhibit A**.

## PARTIES

2.       Plaintiff is the holder of certain Loan Documents, defined below, that are the

subject of this lawsuit.

3.       Harrison and Paget are the guarantors of certain obligations under the Loan

Documents, as further defined and described below.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

5.     First, as stated in Paragraph 1 and explained in Paragraphs 34-43 *infra*, the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Second, there is complete diversity of citizenship between Plaintiff and Guarantors.

7.     Plaintiff is a trust (the "*Trust*"). The Trust is a "real estate mortgage investment conduit" created under the Internal Revenue Code, 26 U.S.C. § 860D, and whose citizenship is determined by the citizenship of its trustee. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465, 468–69 (S.D.N.Y. 2001).

8.     Wilmington Trust, a national banking association, is the trustee of the Trust.

9.     Wilmington Trust is a national banking association. A national banking association is a citizen of the "State in which its main office, as set forth in its articles of association, is located." *Wachovia Bank, N.A. v. Schmidt, III*, 546 U.S. 303, 307 (2006); 28 U.S.C. § 1348.

10.     Wilmington Trust's main office, as set forth in its articles of association, is in Wilmington, Delaware. Wilmington Trust is therefore a citizen of Delaware.

11.     Both Guarantors are individual persons. Upon information and belief, both Guarantors are citizens of the State of California, are domiciled in California, and intend to remain in California.

12.     Thus, there is complete diversity because Plaintiff is a citizen of Delaware and Guarantors are citizens of California.

13.     Venue is properly vested in this District pursuant to 28 U.S.C. § 1391(b) because

Guarantors agreed that:

> This Guaranty was negotiated in the State of New York, and made by each Guarantor and accepted by Lender in the State of New York, and the proceeds of the Note were disbursed from the State of New York, which the parties agree has a substantial relationship to the parties and to the underlying transaction related hereto . . .
>
> Any legal suit, action or proceeding against Lender or any Guarantor arising out of or relating to this Guaranty may, at Lender's option, be instituted in any Federal or State Court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law, and each Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and each Guarantor hereby irrevocably submits to the exclusive jurisdiction of any such court in any suit, action or proceeding. . . .

(Ex. A, § 6.3.)

## BACKGROUND FACTS

### I.    The December 9, 2015 Loan Documents.

14.    On December 9, 2015, Lighthouse Building, LLC ("*Borrower*") executed a promissory note in favor of German American Capital Corporation ("*Original Lender*") in the principal amount of $48,000,000 ("*Note*"). A true and correct copy of the Note, along with a firmly-affixed allonge assigning the Note to Plaintiff, is attached hereto as **Exhibit B**.

15.    Borrower executed the Note in exchange for a loan in the amount of $48,000,000 ("*Loan*").

16.    The terms and conditions of the Loan are memorialized in, among other documents, a Loan Agreement between Borrower and Original Lender executed on December 9, 2015 ("*Loan Agreement*"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit C**.

17.    The Loan is secured by, among other things, real and personal property in an eleven-story office building located at 1155 Market Street in San Francisco, California ("*Property*") and rental income generated by the Property ("*Rents*"). These secured interests are evidenced by: (a) a Deed of Trust, Assignment of Leases and Rents and Security Agreement, dated December 9, 2015 ("*Deed of Trust*"), a true and correct copy of which is attached hereto as **Exhibit D**; (b) an Assignment of Leases and Rents, dated December 9, 2015 ("*ALR*"), a true and correct copy of which is attached hereto as **Exhibit E**; (c) UCC financing statements, true and correct copies of which are attached hereto as **Exhibit F** (the "*UCC Financing Statements*"); and (d) a Cash Management Agreement dated December 9, 2015, a true and correct copy of which his attached as **Exhibit G** (the "*Cash Management Agreement*").

18.    As an inducement to Original Lender to make the Loan to Borrower, Harrison and Paget executed the Guaranty on December 9, 2015. The Guaranty, Note, Loan Agreement, Deed of Trust, ALR, UCC Financing Statements, and Cash Management Agreement are collectively referred to herein as the "*Loan Documents*."

19.    On February 10, 2016, Original Lender assigned all right, title and interest in the Loan Documents to Plaintiff. Plaintiff is therefore the owner, holder and beneficiary of the Loan Documents and is the "Lender" as that term is used in the Loan Documents.

20.    New York law governs the Loan Documents. (*See* Ex. A § 6.3(a); Ex. B at 4; Ex. C § 10.4, Ex. D § 12.01, Ex. E § 5.5.)

**II.    The Relevant Provisions Of The Guaranty.**

21.    Harrison and Paget each "irrevocably and unconditionally guarantee[d] to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations . . . as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise." (Ex. A § 1.1(a).)

22.     "Guaranteed Obligations" is defined to include "(i) Borrower's Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event occurs, payment and performance of all of the Obligations," including all sums due and owing on the Loan. (Ex. A § 1.1(b); Ex. C § 1 at 5, 13.)

23.     Borrower's Recourse Liabilities include:

> any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred . . . ) arising out of or in connection with . . . the misappropriation or conversion by or on behalf of Borrower of. . . any Gross Revenues (including Rents . . . ).

24.     The Guaranty also provides that:

> If all or any part of the Guaranteed Obligations is or shall give rise to a monetary obligation, and such monetary obligation shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantors shall, immediately upon demand by Lender . . . pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender.

(Ex. A § 1.4.)

25.     Guarantors agreed to numerous other relevant provisions in the Guaranty, each of which is described below:

> a.     Guarantors agreed that it "shall not be necessary for Lender . . . in order to enforce the obligations of" the Guaranty to "exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan." (Ex. A § 1.5(v).)
>
> b.     Guarantors agreed that if they breach or fail "to timely perform any provisions" of the Guaranty "upon demand by Lender," they are immediately liable for "all out-of-pocket costs and expenses (including court costs and reasonable attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder, together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender." (Ex. A § 1.7.)
>
> c.     Guarantors agreed that their obligations "shall not be released, diminished, impaired, reduced or adversely affected" by, among other things, (i) the "invalidity, illegality or unenforceability of all or part of the Guaranteed Obligations"; (ii) Borrower's "valid defenses, claims or offsets . . . which render

the Guaranteed Obligations wholly or partially uncollectible from Borrower"; or any "existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations." (Ex. A §§ 2.4(i), 2.4(v) & 2.10.)

## III.    The Relevant Loan Agreement Provisions Addressing Rents.

26.    Borrower previously leased most of the Property to the City and County of San Francisco ("*City*") pursuant to an Office Lease, dated November 9, 2012, and amended thereafter. The Loan Agreement refers to and defines that City lease as the "SF Lease." (Ex. C § 1.1 at 18.)

27.    The Loan Agreement specifically addresses how the parties agreed to handle rents generated by the Property, including the SF Lease rents (as previously defined, "*Rents*"). Specifically, Article 6 of the Loan Agreement provides that all Rents must be deposited into a Clearing Account. (Ex. C § 6.1.)

28.    Section 6.1 of the Loan Agreement also provides that, on a daily basis, all funds in the Clearing Account are swept into Borrower's operating account <u>unless</u> "a Trigger Period is continuing." (Ex. C § 6.1.) If a Trigger Period is continuing then all funds in the Clearing Account are "swept on a daily basis into" a separate account referred to as a Deposit Account. The Deposit Account is "under the sole control and dominion of Lender" and Borrower agreed that it would "have no right of withdrawal" from the Deposit Account. (*Id*.)

29.    The Loan Agreement provides that a "Trigger Period" commences upon the occurrence of "an Event of Default" or "the commencement of a Lease Sweep Period." (Ex. C § 1.1 at 19.)

30.    An "Event of Default" occurs if Borrower fails to pay to Lender amounts due under the Loan Documents within ten (10) Business Days following written notice from Lender.

31.    The Loan Agreement also provides, in relevant part, that a "Lease Sweep Period"

(i)      shall commence on the first Monthly Payment Date[1] following the occurrence of any of the following:

(a)  with respect to each Lease Sweep Lease, the earlier of:

1.      twelve (12) months prior to the earliest stated expiration (including the stated expiration of any renewal term) of a Lease Sweep Lease;

2.      upon the date required under a Lease Sweep Lease by which the Tenant thereunder is required to give notice of its exercise of a renewal option thereunder (and such renewal has not been so exercised)

(Ex. C § 1.1 at 8.)

32.      The Loan Agreement defines the term "Lease Sweep Lease" to include the SF Lease. (Ex. C § 1.1 at 8.)

33.      Section 6.12 of the Loan Agreement contains a waterfall which governs the application of funds in the Deposit Account. Specifically, Section 6.12.1(x)(A) provides that, after a Lease Sweep Period occurs, all Available Cash[2] shall be transferred to a separate Lease Sweep Account controlled by Lender.

**IV.      The Trigger Period And Borrower's Defaults.**

34.      The SF Lease provides that the initial term commenced on February 1, 2013 and expired on January 31, 2023. The City had two (2) five-year options to extend that initial term (each, an "*Extension Option*").

---

[1] The Loan Agreement defines the "Monthly Payment Date" as "the sixth (6th) day of every calendar month occurring during the [Loan] Term" beginning on February 6, 2016. (Ex. C § 1.1 at 12.)

[2] The "Available Cash" is the funds remaining after paying the various expenses identified in the Loan Agreement's waterfall provision. (Ex. C § 16.12.1(x)(A).)

35.     The SF Lease required the City to notify Borrower not less than 12 months, and not more than 18 months, in advance of the expiration date (*i.e.* by no later than January 31, 2022) to exercise the City's first Extension Option.

36.     On or about January 24, 2022, the City sent a written notice providing that the City "wished" to exercise its first Extension Option and thereby extend the SF Lease term for 5 years (*i.e*., from February 1, 2023 through January 31, 2028). The City, however, never actually obtained approval of the Extension Option as required by the SF Lease. Thus, the SF Lease expired on its terms on January 31, 2023.

37.     The SF Lease expiration caused a Trigger Period and Lease Sweep Period to occur under the Loan Agreement. The Trigger Period and Lease Sweep Period commenced on February 6, 2022, *i.e.* the first Monthly Payment Date twelve (12) months prior to the earliest stated expiration of January 31, 2023.

38.     Borrower was therefore required to deposit all Rents into the Deposit Account as of February 6, 2022.

39.     Lender was also entitled to obtain all Available Cash that accrued on and after February 6, 2022.

40.     On February 14, 2024, Lender provided written notice to Borrower of the foregoing. A true and correct copy of that notice is attached hereto as **Exhibit H**.

41.     By further letter dated April 1, 2024, Lender demanded that Borrower pay to Lender all Available Cash disbursed to Borrower since February 6, 2022. A true and correct copy of the foregoing April 1, 2024 demand is attached hereto as **Exhibit I**, without exhibits due to volume.

42.    To date, Borrower has not paid Lender the Available Cash that accrued after February 6, 2022. To Lender's present knowledge, that Available Cash totals approximately $4 million, exclusive of interest.

43.    Borrower's failure to pay the foregoing Available Cash to Lender is "misappropriation or conversion by or on behalf of Borrower of. . . any Gross Revenues (including Rents, Insurance Proceeds, security deposits, advance deposits or any other deposits and Lease Termination Payments)." That misappropriation is also one of the Borrower Recourse Liabilities under the Loan Agreement.

**V.    Guarantors Breached Their Irrevocable And Unconditional Payment Obligations**

44.    On April 16, 2024, Lender sent written notice to Borrower and Guarantors of the foregoing Borrower's Recourse Liability, annexing a copy of the April 1, 2024 demand. Lender also demanded the immediate payment of the Available Cash and confirmed that an Event of Default occurred when Borrower failed to deliver the Available Cash within ten days of Lender's April 1, 2024 demand. A true and correct copy of the April 16, 2024 demand, without exhibits due to volume, is attached hereto as **Exhibit J**.

45.    To date, neither Borrower nor Guarantors have repaid the due and owing Available Cash which, as stated, totals approximately $4 million.

46.    Lender has incurred and continues to incur attorneys' fees to collect the amounts Guarantors owe under the Guaranty.

<u>**COUNT I**</u>

<u>**Breach of Guaranty**</u>

47.    Plaintiff repleads, realleges, and incorporates herein by reference paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48.    The Guaranty is a valid and enforceable agreement.

49.    Under the express terms of the Guaranty, Harrison and Paget each "irrevocably and unconditionally guarantee[d] to Lender . . . the payment and performance of the Guaranteed Obligations," including the payment of Borrower's Recourse Liabilities.

50.    Borrower's misappropriation of Available Cash constitutes a Borrower's Recourse Liability and a Guaranteed Obligation under the Guaranty.

51.    There are no conditions to Guarantors' payment obligation other than those that already occurred, as detailed herein.

52.    Plaintiff complied with all of its obligations under the Guaranty.

53.    Harrison breached his obligations to make payment to Plaintiff under the Guaranty.

54.    Paget breached his obligations to make payment to Plaintiff under the Guaranty.

55.    Harrison and Paget are jointly and severally liable for their breaches of the Guaranty.

56.    Plaintiff has been damaged in excess of $4 million as a direct and proximate cause of the foregoing breaches by Harrison and Paget under the Guaranty.

57.    Plaintiff is entitled to its costs and attorneys' fees incurred in connection with the enforcement of the Guaranty.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully prays for judgment against Guarantors as follows:

(a)    awarding monetary judgment in favor of Plaintiff in an amount to be proven at trial, plus interest;

(b)    awarding Plaintiff the costs, disbursements, and attorneys' fees that Plaintiff incurs in this action; and

(c)    granting Plaintiff such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 30, 2024

DUANE MORRIS LLP

By: s/ David T. McTaggart
       David T. McTaggart
1540 Broadway
New York, New York 10036-4086
Tel.: (212) 471-1814
Fax: (212) 202-4931
Email: dtmctaggart@duanemorris.com

Elinor H. Murarova (SDNY Bar No. 5459441)
190 S. LaSalle Street, Ste 3700
Chicago, Illinois 60603
Tel.: 312-499-6700
Fax: 312-499-6701
Email: ehart@duanemorris.com
*Attorneys for Plaintiff Wilmington Trust, National Association as Trustee, for the Benefit of the Holders of COMM 2016-CCRE28 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2016-CCRE28*